**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARTHA SCARBROUGH o/b/o J.J.S.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO. 18-00516-B** |
| | * | |
| **ANDREW M. SAUL,** | * | |
| **Commissioner of Social** | * | |
| **Security,** | * | |
| | * | |
| **Defendant.** | * | |

<u>**ORDER**</u>

Plaintiff Martha Scarbrough (hereinafter "Plaintiff") brings this action on behalf of her minor child, J.J.S., seeking judicial review of a final decision of the Commissioner of Social Security denying Plaintiff's claim for child supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.* On October 17, 2019, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 15). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 16). Upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

## I.  <u>Procedural History</u>[1]

Plaintiff protectively filed an application for supplemental security income on behalf of her son, J.J.S., on February 16, 2016. (Doc. 11 at 159).  Plaintiff alleged that J.J.S. has been disabled since February 10, 2010, his date of birth, due to clubfoot, being a slow learner, and asthma.  (<u>Id.</u> at 215, 219).  Plaintiff's application was denied at the initial stage on June 15, 2016. (<u>Id.</u> at 107).  Plaintiff filed a timely request for hearing, and on February 9, 2018, Administrative Law Judge Alan E. Michel (hereinafter "ALJ") held an administrative hearing, which was attended by Plaintiff, J.J.S., and Plaintiff's attorney.  (<u>Id.</u> at 57-58).  Both Plaintiff and J.J.S. offered testimony at the hearing.  (<u>Id.</u> at 63-71).  On March 29, 2018, the ALJ issued an unfavorable decision finding that J.J.S. is not disabled.  (<u>Id.</u> at 21).  The Appeals Council denied Plaintiff's request for review on October 18, 2018.  (<u>Id.</u> at 5).  Therefore, the ALJ's decision dated March 29, 2018, became the final decision of the Commissioner. (<u>Id.</u>).

Having exhausted her administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).  Oral argument was conducted on October 31, 2019 (Doc. 17), and the parties agree

---

[1] The Court's citations to the transcript in this order refer to the pagination assigned in CM/ECF.

that this case is now ripe for judicial review and is properly
before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  Issue on Appeal

> **1. Whether the ALJ reversibly erred in finding
> that J.J.S.'s impairments did not meet
> Listing 112.05(B)?**

## III. Factual Background

J.J.S. was born on February 10, 2010 and was six years old at
the time his mother protectively filed an application for
supplemental security income on February 16, 2016.[2]  (Doc. 11 at
159).  At the time of his administrative hearing on February 9,
2018, J.J.S. was seven years old and in the first grade.  (Id. at
64).

Plaintiff had J.J.S. wait an additional year before attending
kindergarten because she felt he wasn't ready to learn the skills
taught in kindergarten.  (Id. at 186).  At school, J.J.S. receives
special education instruction, including more intensive and
supportive reading and math instruction in small group settings,
as well as speech therapy.  (Id. at 64-65, 68, 70, 277-78).  J.J.S.
takes the regular bus to and from school, and he walks to the bus

---

[2] Plaintiff was previously awarded a closed period of benefits for
J.J.S. from February 10, 2010 through July 21, 2011 because
J.J.S.'s impairment of clubfoot was found to have met Medical
Listing 101.02 during that time period.  On July 21, 2011, J.J.S.'s
treating orthopedist noted that he was doing fine and walking
without a problem.  (Doc. 11 at 27).

stop.  (Id. at 65-66).  J.J.S. has friends and enjoys playing and interacting with his peers.  (Id. at 66, 277).  At the hearing, Plaintiff testified that J.J.S. does his homework with her assistance, takes her instructions well, plays well with friends, and does chores, including cleaning his room, washing dishes, and vacuuming.  (Id. at 66, 69).

In a function report dated April 7, 2016, Plaintiff indicated that J.J.S. is limited in his ability to speak clearly, communicate, read, write, perform math, understand the days of the week and months of the year, understand money, tell time, ride a bike, swim, work video game controls, dress and undress dolls or action figures, and pay attention to tasks.  (Id. at 206-13).

J.J.S. has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), for which he takes Vyvanse.  (Id. at 468).  According to Plaintiff, J.J.S. is doing a lot better since his Vyvanse dosage was increased from twenty to thirty milligrams; however, he still seems "a little slow."  (Id. at 68, 578).  Plaintiff listed J.J.S.'s other medications as Azelastine, ProAir HFA, and Ipratropium-Albuterol for asthma,[3] and Montelukast for allergies.  (Id. at 306).

_____

[3] Plaintiff testified that J.J.S. has asthma and uses an inhaler every day.  (Id. at 70).

## IV.  **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the correct legal standards were applied.[4]  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  "Substantial evidence is more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  In determining whether substantial evidence exists, a reviewing court must consider the record as a whole, taking into account evidence both favorable and unfavorable to the Commissioner's decision.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, at *4 (S.D. Ala. June 14, 1999).

---

[4] This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

# V.    Statutory and Regulatory Framework – Childhood Disability Law

The Personal Responsibility and Work Opportunity Act of 1996, which amended the statutory standard for children seeking supplemental security income benefits based on disability, became effective on August 22, 1996.  See Pub. L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. § 1382c).  The definition of "disabled" for children is:

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i); see also 20 C.F.R. § 416.906.

The regulations provide a three-step sequential evaluation process for determining childhood disability claims.  See 20 C.F.R. § 416.924(a).  At step one, a child's age and work activity, if any, are identified to determine if he is engaging in substantial gainful activity.  Id. at § 416.924(b).  At step two, the child's physical/mental impairments are examined to see if he has an impairment or combination of impairments that is severe.  Id. at § 416.924(c).  Under the regulations, a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations[.]"  Id.  To the extent the child is determined to have a severe impairment, the Commissioner must then determine at

step three whether the impairment or combination of impairments meets, medically equals, or functionally equals an impairment listed in Appendix 1 of 20 C.F.R. part 404, subpart P, and otherwise satisfies the duration requirement. Id. at § 416.924(d).

A child's impairment(s) meets the listings' limitations if he actually suffers from limitations specified in the listings for the severe impairment(s). Shinn v. Comm'r of Soc. Sec., 391 F.3d 1276, 1279 (11th Cir. 2004). A child's impairment(s) medically equals the listings if his limitations are at least of equal severity and duration to the listed impairment(s). Id. (citing 20 C.F.R. § 416.926). Where a child's impairment or combination of impairments does not meet or medically equal any listing, then the Commissioner must determine whether the impairment or combination of impairments results in limitations that functionally equal the listings. 20 C.F.R. § 416.926a(a). To establish functional equivalence at step three, the claimant must have a medically determinable impairment or combination of impairments that results in marked limitations in two functional domains or an extreme limitation in one domain. Id. The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. Id. at § 416.926a(b)(1)(i)-(vi).

## VI. **The ALJ's Findings**

In the instant case, the ALJ found that J.J.S., an eight-year-old school-age child who was a preschooler on the date his application was filed, has never engaged in substantial gainful activity. (Doc. 11 at 27). The ALJ also found that J.J.S. has the severe impairments of ADHD, intellectual disability, expressive language delay, and asthma. (Id.). The ALJ determined that J.J.S.'s impairments do not meet or medically equal the severity of any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924, 416.925, and 416.926). (Id.). The ALJ then determined that J.J.S. does not have an impairment or combination of impairments that functionally equal the severity of a listing. (Id. at 28-39). In doing so, the ALJ found that J.J.S. has (1) a less than marked limitation in acquiring and using information; (2) no limitation in attending and completing tasks; (3) no limitation in interacting and relating with others; (4) a less than marked limitation in moving about and manipulating objects; (5) no limitation in the ability to care for himself; and (6) a less than marked limitation in health and physical well-being. (Id. at 33-39). Accordingly, the ALJ determined that J.J.S. is not disabled. (Id. at 39).

## VII. Discussion

### A. The ALJ did not err in finding that J.J.S.'s impairments do not meet Listing 112.05(B).

Plaintiff argues that the ALJ erred in finding that J.J.S.'s impairments do not meet Listing 112.05(B). (Doc. 12 at 2-4). In support of her argument, Plaintiff points to the fact that testing revealed a valid Full Scale IQ of 51 for J.J.S., which satisfies the first of the Listing's two prongs. (Id. at 2-3). With regard to the second prong, Plaintiff contends that the ALJ's findings with regard to her son's ability to acquire and use information and attend and complete tasks are inadequate because they fail to properly assess the opinions of J.J.S.'s teachers and fail to consider the extensive accommodations J.J.S. receives in school. (Id. at 3-4). The Commissioner counters that the ALJ's findings that J.J.S. has less than marked limitations in the areas of acquiring and using information and attending and completing tasks are supported by substantial evidence, and that the ALJ adequately supported his decision by citing extensively from the record and Plaintiff's hearing testimony. (Doc. 13 at 4-9). Having reviewed the record at length, the Court finds that Plaintiff's claim is without merit.

The record reflects that at age five, J.J.S. was evaluated by Michelle Curtis, a certified school psychometrist, using the Battelle Developmental Inventory-Second Edition and the

Developmental Profile 3.  (Doc. 11 at 388).  She noted that J.J.S. completed tasks very slowly and responded slowly to verbal questions.  (Id.).  J.J.S.'s scores in the developmental domains were as follows: low average in the adaptive domain, mild delays in the social-emotional and motor domains, and significant delays in the communication and cognitive domains.  (Id. at 389).

The record contains the Individualized Education Program ("IEP") for J.J.S. for the 2015-2016 and 2017-2018 school years. In the 2015-2016 IEP, it was noted that although J.J.S. was kindergarten age, he was not kindergarten because his mother felt he wasn't ready to learn the skills taught in kindergarten.  (Id. at 186).  Instead, he was attending a private preschool with other five-year-olds.  (Id. at 187).  The IEP reflects that J.J.S. was not functioning on the same level as his same-age peers, and developmental assessments showed significant delays in communication, cognition, and motor skills.  (Id. at 186-87).  It was noted that J.J.S.'s motor skills did not seem to be an issue, and that his inability to complete tasks requiring fine motor skills seemed to be more related to his attention span than his ability.  (Id. at 187).  J.J.S.'s pre-kindergarten teacher expressed concern that J.J.S. had very little memory, could not perform on or around age-appropriate academic activities, and that his degree of focusing was a one out of ten.  (Id.).  It was determined that J.J.S. would receive services in a specialized

preschool inclusion setting three days a week for needs in the areas of communication and cognition and would receive speech/language lead group therapy for ninety minutes a week in the preschool classroom. (Id. at 192).

On July 20, 2016, shortly before starting kindergarten, J.J.S. presented to AltaPointe Health Systems ("AltaPointe"). (Id. at 469). Plaintiff reported that J.J.S. was very hyperactive and had a poor attention span. (Id. at 469). At the intake assessment, it was noted that J.J.S. had appropriate appearance and grooming, normal and cooperative behavior, normal mood, appropriate affect, no speech impairment, perceptions within normal limits, logical and coherent thoughts, fair insight and judgment, and moderate anxiety. (Id.). However, it was also noted that his memory and concentration were impaired. (Id.).

On July 26, 2016, a Wechsler Intelligence Scale for Children-Fifth Edition ("WISC-V") was administered at AltaPointe. (Id. at 495). The scores obtained through the WISC-V yielded a Full Scale IQ of 51, placing J.J.S.'s intellectual abilities within the Extremely Low range. (Id. at 496). The examiner also administered a Test of Variables of Attention ("TOVA"), which was not within normal limits and was suggestive of an attention problem. (Id. at 497). It was noted that J.J.S.'s Attention Comparison Score of -4.57 on the TOVA was in the range of individuals independently diagnosed with ADHD. (Id.).

J.J.S. underwent a psychiatric evaluation at AltaPointe on August 16, 2016, performed by Caroline Morris, CRNP. (Id. at 466-68). On examination, J.J.S.'s general appearance was appropriate, his mood was normal, his affect was appropriate, he was pleasant and smiled easily, his behavior was hyperactive, he showed no speech impairment, his perceptions were within normal limits, his thoughts were logical and coherent, and his orientation was within normal limits. (Id. at 467). However, his memory and concentration were again listed as impaired. (Id.). It was noted that J.J.S. was unable to recall three of three words after five minutes, that he had difficulty answering simple questions, and that he appeared to have a moderate intellectual disability. (Id. at 467-68). He was started on a twenty-milligram daily dosage of Vyvanse. (Id. at 468).

On September 20, 2016, nurse practitioner Morris completed an ADHD Questionnaire, based on her evaluation of J.J.S. the previous month. (Id. at 517). In the questionnaire, Ms. Morris stated that J.J.S. suffered from marked inattention, impulsiveness, and hyperactivity, had moderate impairments in age-appropriate cognitive/communication function and age-appropriate social functioning, had a mild impairment in age-appropriate personal/behavioral function, and had frequent deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. (Id.).

On October 10, 2016, therapist Susan Galberry, LPC of AltaPointe spoke to J.J.S.'s kindergarten teacher, Amanda Gipson. (Id. at 484). Ms. Gipson stated that she could tell when J.J.S. had taken his medication, because he was somewhat flat when on it and hyperactive and impulsive without it. (Id.). Ms. Gipson was not surprised that J.J.S. scored well below average in his Full Scale IQ, and she noted that he was slightly better with letters than numbers and still could not count to five verbally. (Id.). Ms. Gipson reported that J.J.S. would get up and down and bother students when off his medication. (Id.). The teacher also reported that J.J.S. could be inconsistent with taking his medicine. (Id. at 483).

J.J.S. was examined by psychiatrist Marino Tulao, M.D. at AltaPointe on December 1, 2016. (Id. at 477-78). The treatment notes reflect that J.J.S. was stable on Vyvanse twenty milligrams but had run out of the medication three days earlier, which caused a return of his symptoms. (Id. at 477). Plaintiff denied any side effects from the medication and reported that it had the desirable benefits of improved concentration and decreased impulsivity for J.J.S. (Id. at 480). Dr. Tulao noted that J.J.S.'s attention and concentration appeared intact, that his fund of knowledge was intact considering his educational level, and that his intelligence appeared normal. (Id. at 478). Compliance with the medication and therapy were encouraged. (Id.

at 482).

On January 30, 2017, J.J.S. met with the therapist, Ms. Galberry, for the first time. (Id. at 554). The therapist noted that J.J.S. seemed to have an articulation problem, making him difficult to understand at times, and that he was able to focus while playing a game. (Id.).

J.J.S. returned to AltaPointe on February 27, 2017, where he was examined by nurse practitioner Morris. (Id. at 540-42). On that date, Plaintiff reported that he was doing well in school, with no bad reports and good grades. (Id. at 540). Plaintiff reported no side effects from the Vyvanse, but she stated that the medication seemed to wear off around 4:00 p.m. (Id.). On examination, J.J.S. exhibited fair insight and judgment, intact memory, intact concentration and attention, intact fund of knowledge considering his educational level, and normal intelligence. (Id. at 540-41).

On March 6, 2017, J.J.S.'s teacher reported to his therapist, Ms. Galberry, that J.J.S. was not taking his medicine consistently and that she could easily tell which days he had not taken his medicine because he was silly and frequently off task on those days. (Id. at 551). At his final therapy session of the school year on May 8, 2017, J.J.S. was able to participate and stay on task while reading a book. (Id. at 547).

J.J.S.'s final kindergarten report card reflects a range of

grades, including "Needs Help", "Satisfactory", and "Good". (Id. at 291-292). A Report of Progress sent on May 25, 2017 shows that, by April 2017, J.J.S. had met all the goals of his 2016-2017 IEP. (Id. at 289). Specifically, he was able to name all letters of the alphabet and give the most common sound they make with eighty percent accuracy; count out up to ten objects and then match the written numeral matching the number he counted with eighty percent accuracy; write all letters of the alphabet when given visual and verbal prompting with eighty percent accuracy; and answer "who, what, where, when" questions with guided support and prompting to identify the main topic and retell key details of a text with eighty percent accuracy. (Id.).

In his 2017-2018 IEP, it was noted that J.J.S. was being taught using the kindergarten reading curriculum but was receiving more intensive/supportive instruction in a small group setting, where he was given much more repetition and practice of the skills taught. (Id. at 277). In math, J.J.S. was also provided more intensive and supported instruction in a small group setting, where the material was presented at a slower pace and hands-on use of manipulatives were incorporated into the instruction of the material. (Id.). The IEP reflected that J.J.S. had made progress in reading and a lot of progress in math but would continue to need support and opportunities to practice and further understand his reading and math skills, and that his limited skills in reading

15

and math affected his participation in those general education curriculum areas. (Id. at 278). It was determined that J.J.S. would receive 225 minutes of small-group instruction per week in both reading and math, with assignments and tests being read aloud, extended time to complete assignments and tests given, tests taken in the resource room in a small group, and the possibility of tests being modified by having the number of choices reduced. (Id. at 284). J.J.S. would also receive one hour of small-group language therapy per week to address his expressive language delays, which adversely impacted his ability to participate in classroom discussions and elaborate when answering questions during academic activities in the general education classroom. (Id.).

J.J.S. again presented to AltaPointe on May 26, 2017, where he was seen by nurse practitioner Morris. (Id. at 537-39). At that visit, Plaintiff reported that his Vyvanse worked well but was wearing off around 11:00 a.m., making J.J.S. less focused in the afternoons. (Id. at 537). Plaintiff reported no major mood or behavioral issues, and she stated that J.J.S.'s sleep and appetite were good. (Id.). An examination revealed fair insight and judgment, orientation to time, place, person, and situation, and intact memory. (Id. at 537-38). Nurse practitioner Morris noted: "Intelligence appears MR range." (Id. at 538). Plaintiff was instructed to continue giving J.J.S. his current dosage of Vyvanse through the summer, but it was noted that the dosage would

be increased to thirty milligrams shortly before the start of the next school year.  (Id. at 537).

J.J.S. returned to AltaPointe on August 3, 2017 and was seen by Julie Bernstein, D.O.  (Id. at 581-83).  Plaintiff reported that J.J.S. was doing well on his current medication over the summer in the less demanding home setting, but it was decided to continue with the plan to increase his dosage of Vyvanse to thirty milligrams due to teacher complaints during the previous school year that the lower dosage was wearing off early.  (Id. at 581).  On examination, Dr. Bernstein observed that J.J.S. had logical thought, intact memory, fair insight and judgment, and intact attention and concentration.  (Id. at 581-82).  Dr. Bernstein opined that J.J.S.'s intelligence appeared to be in the borderline range.  (Id. at 582).

J.J.S. resumed individual therapy with Susan Galberry, LPC on September 6, 2017.  (Id. at 593).  Ms. Galberry noted that J.J.S.'s low IQ interfered with his ability to process information, but that he remained stable with his ADHD symptoms.  (Id.).  On October 18, 2017, Ms. Galberry met with his general and special education teachers, who stated that J.J.S. had been silly, wiggly, and unfocused more often than not, which had been increasing over the past few weeks.  (Id. at 588). His special education teacher also expressed concern about his medication.  (Id.).  At his therapy session that day, J.J.S. was able to follow directions and was

very helpful in loading boxes for the therapist.  (Id. at 589).
The therapist noted that J.J.S. could not remember whether he had
taken his medication every day, and that he reported that he ran
out of time in the mornings before the school bus arrived, thus
hindering his ability to take his medicine some mornings.  (Id.).

In an Annual Goal Progress Report sent on October 18, 2017,
it was noted that J.J.S. had made minimal progress on the 2017-
2018 IEP goal of being able to accurately blend and read age-
appropriate words independently with eighty percent accuracy.
(Id. at 326).  However, with regard to the goal of producing
grammatically correct simple sentences when answering questions
using appropriate adjectives and attributes related to given
pictures, objects, or activities with eighty percent accuracy, it
was noted: "[J.J.S.] is doing GREAT when answering questions!  Keep
up the great work!"  (Id.).

On October 26, 2017, J.J.S. again presented to Dr. Bernstein
at AltaPointe.  (Id. at 578).  At that visit, Plaintiff reported
that J.J.S.'s school performance and behavioral issues had
significantly improved on the higher dose of Vyvanse, and that his
conduct was currently good at school and at home.  (Id.).  On
examination, Dr. Bernstein found that J.J.S. had good insight and
judgment, intact memory, intact attention and concentration, an
intact fund of knowledge considering his educational level, and
intelligence that appeared normal.  (Id. at 578-79).  During

18

therapy on December 6, 2017, Ms. Galberry, J.J.S.'s therapist, noted that he was able to sustain attention during their activity. (Id. at 586).

On December 12, 2017, J.J.S.'s special education teacher, Megan Bias, completed a teacher questionnaire. (Id. at 316-23). In the functional domain of acquiring and using information, Ms. Bias opined that J.J.S. had very serious problems expressing ideas in written form and providing organized oral explanations and adequate descriptions; serious problems comprehending oral instructions, reading and comprehending written material, comprehending and doing math problems, learning new material, and recalling and applying previously-learned material; obvious problems understanding school and content vocabulary and applying problem-solving skills in class discussions; and a slight problem understanding and participating in class discussions. (Id. at 317). For the domain of attending and completing tasks, Ms. Bias opined that J.J.S. had a very serious problem carrying out multi-step instructions; serious problems completing class/homework assignments, completing work accurately without careless mistakes, working at a reasonable pace/finishing on time, and focusing long enough to finish an assigned activity; obvious problems paying attention when spoken to directly, refocusing to task when necessary, carrying out single-step instructions, organizing his own things or school materials, and working without distracting

himself or others; slight problems sustaining attention during play/sports activities and changing from one activity to another without being disruptive; and no problem waiting to take turns. (Id. at 318). Ms. Bias stated: "When [J.J.S.] is on his medication he is able to pay better attention. When not on medication he is very silly and inattentive, and distracting to himself & others." (Id.). She also noted that J.J.S.'s functioning changed after taking his ADHD medication, stating: "When he takes medication he is calm & quiet and is able to complete assignments." (Id. at 322). She further opined that J.J.S. "tries very hard but requires a lot of assistance in reading and math. He has a hard time blending to read words and counting higher than 20. He has very neat & precise handwriting and coloring skills, but is very slow." (Id.).

J.J.S.'s first grade report card from the first quarter of the 2017-2018 school year reflects the following grades: 86-B in reading, "Good" in music, "Good" in health, 87-B in English, 82-B in spelling, 78-C in math, 100-A in social studies, 100-A in science, "Satisfactory" in handwriting, and "Good" in physical education. (Id. at 327). His second quarter grades were: 85-B in reading, "Good" in music, "Good" in health, 85-B in English, 74-C in spelling, 78-C in math, 100-A in social studies, 100-A in science, "Needs Help" in handwriting, and "Good" in physical education. (Id.).

As noted *supra*, Plaintiff's sole claim on appeal is that the ALJ erred in finding that J.J.S. does not meet the criteria of Listing 112.05(B) (Intellectual Disorder for children age 3 to 18). Listing 112.05(B) is satisfied by meeting both of the following criteria:

> 1. Significantly subaverage general intellectual functioning evidenced by a or b:
> a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
> b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and
> 2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
> a. Understand, remember, or apply information (see 112.00E1); or
> b. Interact with others (see 112.00E2); or
> c. Concentrate, persist, or maintain pace (see 112.00E3); or
> d. Adapt or manage oneself (see 112.00E4).

20 C.F.R. Pt. 404 Subpt. P., App. 1 § 112.05(B).

Although the ALJ questioned the "preciseness" of J.J.S.'s Full Scale IQ average, he acknowledged that the record does contain standard testing revealing a Full Scale IQ below 70, thus meeting the first prong of Listing 112.05(B). (Doc. 11 at 28). However, because he found that J.J.S.'s impairments had caused no marked or extreme limitations in the four non-physical childhood functional domains (acquiring and using information, attending and completing

tasks, interacting with others, and caring for oneself), the ALJ found that J.J.S.'s impairments necessarily could not have caused two marked limitations or one extreme limitation in the four areas of mental functioning found in Paragraph 2 of Listing 112.05(B). (Id.). Accordingly, the ALJ determined that J.J.S. did not meet the second prong of Listing 112.05(B) because he does not have one extreme limitation or two marked limitations in the four areas of mental functioning. (Id.).

Plaintiff's precise claim on appeal is that the ALJ erred in finding that J.J.S. has less than marked limitations in the areas of understanding, remembering, or applying information and concentrating, persisting, or maintaining pace, and, therefore, did not meet Listing 112.05(B). However, as noted, the ALJ found that because J.J.S.'s impairments caused no marked or extreme limitations in the non-physical childhood *functional domains*, they "necessarily" could not have caused two marked limitations or one extreme limitation in the *areas of mental functioning* listed in Paragraph 2 of Listing 112.05(B). Thus, in furtherance of her argument that J.J.S. has marked or extreme limitations in the areas of understanding, remembering, or applying information and concentrating, persisting, or maintaining pace, Plaintiff challenges the ALJ's findings that J.J.S. has less than marked limitations in the corresponding functional domains of acquiring

and using information and attending and completing tasks.[5]

With regard to the functional domain of acquiring and using information, the ALJ found that J.J.S. has a less than marked limitation. (Id. at 34). The ALJ acknowledged that J.J.S.'s teacher, Ms. Bias, reported that he had serious to very serious problems comprehending written material, comprehending and doing math problems, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, and recalling and applying previously learned material. (Id.). However, the ALJ noted that J.J.S.'s most recent report card reflected that J.J.S. was making A's, B's, and C's, and he observed that J.J.S. had grades of 100 percent in both social studies and science. (Id.). The ALJ also referenced Plaintiff's hearing testimony that J.J.S. was doing pretty well in school and making some academic progress with one-on-one help, and he noted Plaintiff's testimony that J.J.S.'s grades improved with the accommodations provided through the IEP. (Id.).

In the domain of attending and completing tasks, the ALJ found that J.J.S. has no limitation. (Id. at 35). The ALJ acknowledged Ms. Bias' opinions that J.J.S. has serious to very serious problems focusing enough to finish an assigned activity or task, carrying

---

[5] Plaintiff does not challenge the ALJ's findings with regard to any other functional domains or areas of mental functioning.

out multi-step problems, completing class/homework assignments, completing work accurately without careless mistakes, and working at a reasonable pace and finishing on time. (Id.). But, the ALJ pointed out that Ms. Bias specifically noted that J.J.S. is able to pay better attention when on his medication, and that he is very silly, inattentive, and distracting to himself and others when not on his medication. (Id.). The ALJ noted that at J.J.S.'s most recent visit to AltaPointe on record, Plaintiff reported that his school performance and behavioral issues had significantly improved on the higher dose of Vyvanse, and that his conduct was good at school and at home. (Id.). Finally, the ALJ noted that Plaintiff testified that J.J.S. does his homework and completes his chores. (Id.).

Plaintiff argues that the ALJ's assessment is inadequate because the ALJ failed to specify the weight he gave to Ms. Bias' opinions regarding J.J.S.'s problems in the domains of acquiring and using information and attending and completing tasks. (Doc. 12 at 3-4). Teachers, and other non-medical personnel who are able to observe and interact with a child on a daily basis, "are valuable resources in determining the severity of a child's impairment and how a child typically functions compared to other children his age." Cox v. Astrue, 2012 U.S. Dist. LEXIS 44958, at *25, 2012 WL 1094443, at *8 (S.D. Ala. Mar. 30, 2012). Although the ALJ is required to consider the opinions of nonmedical sources

such as teachers, "non-medical testimony can neither establish the existence of a medically determinable impairment, nor establish disability absent corroborating competent medical evidence." Cox, 2012 U.S. Dist. LEXIS 44958, at *26, 2012 WL 1094443, at *9 (citations omitted).

Plaintiff is correct that in evaluating the teacher questionnaire completed by Ms. Bias, the ALJ did not specify the precise weight given to Ms. Bias' opinions, for example by using terms such as "great weight," "some weight," or "little weight," as is typical in disability-benefits decisions. See 20 C.F.R. § 416.927(f)(2) ("The adjudicator generally should explain the weight given to opinions from [nonmedical] sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent review to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). However, the ALJ referenced and discussed Ms. Bias' statements and opinions in detail in multiple sections of his decision. (See Doc. 11 at 31, 33-38). Indeed, the ALJ thoroughly considered, accounted for, and discussed Ms. Bias' questionnaire in his decision, and the decision reflects that he accepted and took the teachers', including Ms. Bias', statements and opinions into account in reaching his findings. Moreover, Plaintiff fails to explain how the ALJ's findings are impacted by the ALJ's failure to specifically assign a weight to

Ms. Bias' opinions. Accordingly, although the Court discerns no error in the ALJ's failure to specify the precise weight afforded to Ms. Bias' opinions in light of his thorough consideration and discussion of the teacher questionnaire, assuming any such error existed, it would be harmless. See Wright v. Barnhart, 153 F. App'x 678, 684 (11th Cir. 2005) (per curiam) ("Although the ALJ did not explicitly state what weight he afforded the opinions of [four physicians], none of their opinions directly contradicted the ALJ's findings, and, therefore, any error regarding their opinions is harmless."); Sparks v. Berryhill, 2018 U.S. Dist. LEXIS 93951, at *15, 2018 WL 2676578, at *5 (M.D. Fla. June 5, 2018) (finding that the ALJ's failure to specifically assign weight to a treating doctor's medical opinion was harmless because the plaintiff failed to assert how the ALJ's findings were affected by his failure to specifically weight the doctor's opinion); Brito v. Comm'r, Soc. Sec. Admin., 687 F. App'x 801, 804 (11th Cir. 2017) (per curiam) (holding that the ALJ did not reversibly err by failing to assign specific weight to a doctor's treatment notes and mental status report when "the ALJ's discussion of [the doctor's] opinions was stated with 'at least some measure of clarity' sufficient to review the grounds for his decision") (citation omitted); Swilling ex rel. L.G.M.W. v. Astrue, 2011 U.S. Dist. LEXIS 80399, at *7, 2011 WL 2982522, at *3 (M.D. Ala. July 22, 2011) ("Even though[] the ALJ did not specifically state he

considered the teacher's questionnaire, his general comment about opinion evidence is sufficient to show that he did consider all the evidence. Moreover, even if it was error, it is harmless. The opinion of the ALJ shows that he carefully considered the evidence in this case and was extremely familiar with it. A remand is not required.").

Plaintiff also argues that the ALJ failed to consider or address the accommodations J.J.S. receives in school. (Doc. 12 at 3-4). On the contrary, the ALJ specifically recited J.J.S.'s accommodations at school, including more intensive instruction in reading and math, speech services, extended time to complete assignments and tests, the ability to have assignments and tests read aloud, tests administered in the resource room, and preferential seating and shortened assignments. (Doc. 11 at 30). The ALJ also referenced those accommodations in his discussion of J.J.S.'s limitations in acquiring and using information. (Id. at 34). Although the ALJ was required to (and did) consider J.J.S.'s special education and the accommodations he received, see 20 C.F.R. § 416.924a(b)(7)(iv), he was permitted to rely upon J.J.S.'s performance in school as evidence in determining whether J.J.S. had marked or extreme limitations in the childhood functional domains or in Listing 112.05(B)'s areas of mental functioning. See D.A.P. ex rel. Perry v. Colvin, 2014 U.S. Dist. LEXIS 84598, 2014 WL 2855055, at *6 (S.D. Ga. June 20, 2014) (stating that "an

ALJ may properly rely upon a claimant's performance in special education classes for purposes of determining whether the claimant meets the relevant Listings for intellectual disability"); Harris v. Comm'r of Soc. Sec., 330 F. App'x 813, 815 (11th Cir. 2009) (per curiam) (finding that substantial evidence supported the ALJ's decision that the claimant did not meet Listing 12.05(C) where he found that the claimant, *inter alia*, "did well in special education classes"); Hill o/b/o J.M.W. v. Colvin, 2017 U.S. Dist. LEXIS 121602, at *30, 2017 WL 3301223, at *10 (M.D. Ga. June 23, 2017) ("Claimant's school records and additional medical evidence provided substantial evidence to support the ALJ's determination" that the claimant had less than marked limitations in all domains, despite the fact that the claimant received numerous accommodations at school), report and recommendation adopted sub nom. Hill v. Berryhill, 2017 U.S. Dist. LEXIS 121314, 2017 WL 3299038 (M.D. Ga. Aug. 2, 2017). Thus, Plaintiff's contention that the ALJ did not consider or address J.J.S.'s accommodations at school is simply without merit.

Substantial evidence supports the ALJ's findings that J.J.S. has less than marked limitations in the area of understanding, remembering, or applying information and in the domain of acquiring and using information. There is no question that J.J.S. has an intellectual disability and that his Full Scale IQ score obtained through testing in July 2016 is extremely low. However, the

Eleventh Circuit has recognized that a valid IQ score is not conclusive of intellectual disability "where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Popp v. Heckler, 779 F.2d 1497, 1500 (11th Cir. 1986) (same). Notably, J.J.S.'s IQ was tested before he began school and, more importantly, before he began taking Vyvanse, which the record clearly demonstrates led to a striking improvement in his ability to focus and function. After J.J.S. was prescribed Vyvanse, examinations at AltaPointe revealed no agitation or retardation, normal eye contact, linear and logical thought, intact long- and short-term memory, no speech impairment, good hygiene and grooming, alertness, orientation to time, place, person, and situation, appropriate affect, normal mood, and fair or good insight and judgment. (Doc. 11 at 477-78, 537-38, 540-41, 578-79). Although the AltaPointe records contain one notation that J.J.S.'s intelligence was in the "MR range" and two other notations that J.J.S. had borderline intelligence or a moderate intellectual disability (id. at 468, 538, 582), there are a number of other notations, including in the most recent treatment record, that his intelligence appeared normal and his fund of knowledge was intact considering his educational level. (Id. at 478, 541, 579). Also, the record contains treatment notes from The Franklin Primary Health Center which consistently reflect that J.J.S.'s

29

behavior was appropriate for his age.  (Id. at 414, 417, 420, 426, 429, 447, 451, 455, 459, 617, 622, 625, 629).  While the school and therapy records and statements from J.J.S.'s teachers document that he had difficulty academically, particularly in the subjects of reading and math, J.J.S. was able to meet all his IEP goals for the 2016-2017 school year and, as the ALJ noted, his grades from both quarters of the 2017-2018 school year were generally good. (See id. at 289, 327).  At the hearing, Plaintiff testified that J.J.S. was doing pretty well in school and making progress with the help of one-on-one instruction, although she noted that he was "a little slow on reading."  (Id. at 68-70).  Plaintiff also reported to AltaPointe that J.J.S.'s school performance and behavioral issues had significantly improved on the higher dose of Vyvanse.  (Id. at 578).  In view of the foregoing, which suggests that J.J.S. has no more than a moderate intellectual disability and is able to perform with some success in the academic setting, there is substantial evidence to support the ALJ's conclusions that J.J.S. has less than marked limitations in the area of understanding, remembering, or applying information and in the domain of acquiring and using information.

The record also contains substantial evidence to support the ALJ's determination that J.J.S. does not have marked or extreme limitations in the area of concentrating, persisting, or maintaining pace and the domain of attending and completing tasks.

30

As an initial matter, the Court notes that "[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (internal quotation and citation omitted). Although J.J.S. has been diagnosed with ADHD that, when untreated, appears to severely interfere with his ability to focus, maintain attention, complete tasks, and control impulses, the record reflects that his difficulty in these areas is largely eliminated by compliance with his medication. Indeed, although his teacher, Ms. Bias, opined that J.J.S. had numerous problems, including some serious or very serious problems, in the domain of attending and completing tasks, she qualified her opinions by noting that J.J.S. "is able to pay better attention" on his medication and that "[w]hen he takes medication he is calm & quiet and is able to complete assignments." (See id. at 318, 322). The therapist's notes, which describe conversations with J.J.S.'s teachers, also reflect the marked improvement in his behavior and ability to concentrate on the days he takes the medication. (See id. at 483-84, 551, 588). At J.J.S.'s first visit to AltaPointe after being prescribed Vyvanse in August 2016, Plaintiff reported the benefits of improved concentration and decreased impulsivity from the medication. (Id. at 480). In February 2017, Plaintiff reported that J.J.S. was doing well in school with good grades and no bad reports (id. at 540), and in May 2017, she stated that Vyvanse

worked well but was wearing off around midday.  (Id. at 537).
After the dose was increased, Plaintiff reported that J.J.S.'s
school performance and behavioral issues had significantly
improved on the higher dose of Vyvanse, and that his conduct was
good at both school and home.  (Id. at 578).  The record strongly
suggests that after J.J.S. started taking Vyvanse, most, if not
all, of his difficulties in concentrating, attending to and
completing tasks, and controlling impulsive behavior were either
a result of the medication wearing off or of J.J.S.'s failure to
take the medication daily as prescribed.  (See id. at 318, 322,
477, 483-84, 537, 540, 551, 588-89); see also 20 C.F.R. §
416.930(b) ("If you do not follow the prescribed treatment without
a good reason, we will not find you disabled . . . .").

After J.J.S. was prescribed Vyvanse in August 2016, the
examination notes from AltaPointe generally reflect that J.J.S.'s
concentration and attention appeared to be intact.  (See id. at
478, 541, 579).  The only exception was in May 2017, when it was
noted that Plaintiff reported a new problem with attention and
concentration due to J.J.S.'s twenty-milligram dose of Vyvanse
wearing off early in the day.  (See id. at 537-38).  J.J.S.'s
therapist typically reported that he was able to maintain focus,
sustain attention, and stay on task.  (See id. at 483, 547, 550,
554, 586, 589, 593).  Plaintiff also reported that J.J.S. accepts
her instruction well, does his homework, and does chores such as

cleaning his room, washing dishes, and vacuuming. (Id. at 66, 69). The foregoing constitutes substantial evidence to support the ALJ's findings that J.J.S. does not have marked or extreme limitations in the area of area of concentrating, persisting, or maintaining pace or in the functional domain of attending and completing tasks. Accordingly, Plaintiff's claim must fail.

## VIII.　　Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for child supplemental security income be **AFFIRMED.**

**DONE** this **7th** day of **November, 2019.**

**　　/s/ SONJA F. BIVINS　　**
**UNITED STATES MAGISTRATE JUDGE**